IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| UNITED STATES OF AMERICA | § | |
| --- | --- | --- |
| | § | |
| v. | § | No. 4:17CR01 |
| | § | Judge Mazzant |
| FEISHENG LIANG (1) | § | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS**

Liang's motion to dismiss misstates the facts and lacks legal merit. The motion should be denied.

**I.   FACTS**

The defendant, a citizen of the People's Republic of China, was the Captain of a Chinese flagged vessel, the *Yue Shan Wei Yu*. On November 24, 2016, the United States Coast Guard Cutter (USCGC) *Hamilton* discovered the *Yue Shan Wei Yu* in international waters in the Eastern Pacific Ocean, approximately 1000 nautical miles west of the Galapagos Islands.[1] The *Yue Shan Wei Yu* was proceeding on a westerly course and flying a Chinese flag.[2]

The *Yue Shan Wei Yu* was transiting a known drug trafficking corridor.

---

[1] Government Exhibit (GE) 1, pg. 2.   For ease of location, the referenced material is highlighted.

[2] GE 1, pg. 3.

1

Accordingly, the USCGC *Hamilton* dispatched its helicopter (CG 6519) in order to observe the *Yue Shan Wei Yu*. While observing, the crew of the *Hamilton*'s helicopter noted that the crew of the *Yue Shan Wei Yu* was jettisoning large bundles into the ocean.[3] These bundles appeared to be secured together by rope and have buoys attached to them.[4] This conduct was consistent with narcotics traffickers in that area of the Eastern Pacific Ocean who often jettison narcotics when approached by the United States Coast Guard (USCG). These narcotics bundles (which can be worth several million dollars each) are typically fitted with GPS trackers which allow traffickers to locate and retrieve the bundles at a later time. The bundles being jettisoned by the crew of the *Yue Shan Wei Yu* were later retrieved by members of the Coast Guard and found (using a NIK test) to contain cocaine.[5]

The Coast Guard helicopter took approximately 190 photographs of the *Yue Shan Wei Yu* from nearly every angle. These photos do not reveal any fishing, caught fish, or commercial fishing equipment in use. There is a crumpled net visible on one of the aft decks but no other equipment that would typically be associated with commercial fishing. The Coast Guard helicopter also took several videos documenting the entire exterior of the ship from the air – one video is nearly 30 minutes long.

---

[3] GE 1, pg. 2.

[4] GE 1, pg. 2.

[5] GE1, pg. 2.

The USCGC *Hamilton* attempted to hail the *Yue Shan Wei Yu* by radio without a response from the *Yue Shan Wei Yu*. It was later determined that this claimed fishing vessel was over 9000 miles from its home port but contained no radios.[6] Members of the United States Coast Guard assigned to the USCGC *Hamilton* were deployed to attempt an alongside right of approach shortly thereafter. During this alongside approach, the Coast Guard members took approximately 21 photographs of the *Yue Shan Wei Yu*, its crew, and the identification cards of the crew. The Coast Guard also took a video of the *Yue Shan Wei Yu* as it floated, circling the vessel in order to get a 360 degree view. No fishing or commercial fishing equipment was observed. The vessel appeared to be badly rusted.

The next day, personnel on the USCGC *Hamilton* learned that the government of China had granted permission to stop, board, and search the vessel under its authority as the flag state.[7] The boarding team took 72 high-resolution photos documenting all portions of the ship. The team created a detailed drawing of the ship. They also took four videos totaling approximately eight minutes which document the engine-room, the fantail, the galley, access ports, storage compartments, food, fuel and water tanks, interior storage areas, two refrigeration units, empty voids in the deck, walls that are rusted through, the helm, two satellite phones, radar, autopilot, and crew quarters. The narration of the

---

[6] GE 1, pg. 3.

[7] GE 1, pg 6.

video and the videos themselves also reveal that the only fishing gear found was a crumpled net on the deck.

In addition to the rusted condition of the hull, the videos reveal that the smoke stacks have completely rusted through and are no longer attached to the engine. Moreover, the video reveals fuel sitting in open five-gallon buckets which are used to fuel the engines.

No cocaine or other narcotics were found on board and ION-scans on board were negative for cocaine. These findings, along with all videos, photos, drawings, and statements regarding the ship and its condition were preserved and provided in discovery.

During the course of the boarding as well as during the ensuing days, the Coast Guard personnel discovered multiple hazardous conditions such as sparking batteries in an engine room in which there was fuel and oil in the bilges.[8] There were multiple engine explosions.[9] Ultimately, the *Yue Shan Wei Yu* lost all power and propulsion and was dead in the water.[10] Moreover, the defendant (who was the ship's captain) advised the Coast Guard that his ship had less than two day's food left on board and the remaining food was rotten and not fit for consumption.[11] The Coast Guard personnel observed that the crew had become ill from the conditions. Finally, the *Yue Shan Wei Yu* could not be towed

---

[8] GE 1, pg. 6, 7.

[9] GE 1, pg. 9, 10.

[10] GE 1, pg. 11.

[11] GE 1, pg. 9.

4

because rusting had made the towing equipment unserviceable.[12]

On December 1, 2016, the Government of China authorized the sinking of the vessel as a hazard to navigation and requested that the United States detain the crew for suspected drug trafficking.[13] On December 2, 2016 the USCG sunk the vessel.[14]

On December 23, 2016, China provided its consent for the United States to exercise jurisdiction over this case.[15]

## II. THE DEFENDANT'S MOTION AND BRIEF

The defendant filed a motion to dismiss the Indictment (Docket #136) on July 6, 2018, claiming that the Coast Guard intentionally and in bad faith destroyed exculpatory evidence. He further alleged that the actions were taken without the consent of China. In his motion he lists no specific items of evidence that were supposedly destroyed. Eleven days later the defendant filed a "brief in support" of his motion (Docket #170).[16] The defendant complains that the following supposedly exculpatory evidence was destroyed: (1) fishing equipment; (2) freezers; and (3) the boat itself (which he bizarrely contends was

---

[12] GE 1, pg. 6-7.

[13] GE 1, pg. 11.

[14] GE 1, pg. 12.

[15] Docket # 139, NOTICE of State Department Certification for the Vessel *Yue Shan Wei Yu*, Exhibit 1.

[16] Local Rule 47(a)(2) requires that a motion and its briefing be contained in a single document. The defendant offers no explanation for filing his brief (which contains facts and argument unique to the brief) separately and nearly two weeks after the initial motion.

5

too small to hold the very packages that the video tape shows being jettisoned from it).

## III. LAW AND ARGUMENT

### A. The Defendant's Objection to Lack of Chinese Consent to the Sinking of the Vessel is Unavailing.

The defendant claims that "the actions of the United States Coast Guard were without consent of the flag nation, China. Therefore, the United States Coast Guard and this Honorable Court does not have jurisdiction to proceed with action against [the defendant]." Doc. #136 at 2. As the referenced exhibits demonstrate, this contention is factually incorrect. Moreover, as a matter of law, the defendant is wrong.

As charged here, the Maritime Drug Law Enforcement Act ("MDLEA"), 46 U.S.C. §§ 70501-70508, prohibits an individual from possessing with intent to distribute a controlled substance "on board a vessel subject to the jurisdiction of the United States." 46 U.S.C. § 70503(a)(1). Under § 70502, a "vessel subject to the jurisdiction of the United States" includes "a vessel registered in a foreign nation if that nation has consented or waived objection to the enforcement of United States law by the United States." 46 U.S.C. §§ 70502(c)(1)(C). A foreign nation's response as to a request for consent to the enforcement of United States law under § 70502(c)(1)(C) "may be obtained by radio, telephone, or similar oral or electronic means" and "is proved conclusively by certification of the Secretary of State or the Secretary's designee." 46 U.S.C. § 70502(c)(2).

Under 46 U.S.C. § 70505, "[a] person charged with violating section 70503 . . . does

not have standing to raise a claim of failure to comply with international law as a basis for a defense. A claim of failure to comply with international law in the enforcement of this chapter may be made only by a foreign nation . . . [and] does not divest a court of jurisdiction and is not a defense to a proceeding under this chapter." 46 U.S.C. § 70505.

Thus, "[t]he legitimacy of a flag nation's consent is . . . a question of international law that can be raised only by the foreign nation." *United States v. Bustos-Useche*, 273 F.3d 622, 627 (5th Cir. 2001). Accordingly, the defendant's request that the case be dismissed due to a supposed lack of consent by China (aside from being factually inaccurate) is without basis in law. Only China can raise the issue of the validity of their consent.

**B.  The Sinking of the *Yue Shan Wei Yu* was Appropriately Conducted, the Vessel did not Contain Exculpatory Evidence, and the Government did not Act in Bad Faith.**

The Supreme Court has addressed obligations to preserve potentially exculpatory information in two leading cases. In *California v. Trombetta*, 467 U.S. 479 (1984), the Court held that due process requires the preservation of evidence only where that evidence "both possess[es] an exculpatory value that was apparent before the evidence was destroyed" and is "of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id*. at 488-89. Applying these standards, the Court held that California's "policy of not preserving breath samples" of suspected drunk drivers was "without constitutional defect." *Id.* at 488. Because the

7

officers acted in accordance with this policy, and the record contained "no allegation of official animus towards respondents or of a conscious effort to suppress exculpatory evidence," the Court held there was no due process violation. *Id.*

In *Arizona v. Youngblood,* 488 U.S. 51 (1988), the Court rejected a claim that a *Brady* violation resulted from the failure to properly preserve semen samples from a molestation victim's body and clothing, holding that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Id.* at 58.

The Fifth Circuit has summarized the test as follows:

> "Absent a showing of bad faith, failure to preserve potentially useful evidence does not constitute a denial of due process. *Ariz. v. Youngblood*, 488 U.S. 51, 57-58, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988). In sum, impermissibly withheld evidence must be either (1) material and exculpatory or (2) only potentially useful, in combination with a showing of bad faith on the part of the government. *Ill. v. Fisher*, 540 U.S. 544, 124 S.Ct. 1200, 157 L.Ed.2d 1060 (2004)."

*Bower v. Quarterman*, 497 F.3d 459, 476–77 (5th Cir. 2007).

The *Yue Shan Wei Yu* was minimally disguised as a commercial fishing vessel, containing only one dried up old fishing net. This is evidenced by the voluminous photographs and video evidence that were preserved by the USCG and disclosed to the defendant. If the vessel had been preserved it would have served as inculpatory, rather than exculpatory, evidence.

The defendant has not pointed to a single thing on the boat which would have tended

8

to exculpate him, nor can any such item be found. Even if there were fish or fishing equipment present on the vessel, this does not tend to exculpate the defendant because a person can be both a fisherman and a drug trafficker at the same time. The fact of fishing, even on a fishing vessel, would not tend to exculpate the defendant where, as here, he was seen on video jettisoning a ton of cocaine overboard any more than the presence of golf clubs in a golf cart would exculpate a golfer who was videotaped shooting his rival on the course.

The defendant's reliance on ION swab results is a red herring. The Coast Guard records readily detail that no ION swabs conducted on the vessel tested positive for cocaine. Leaving an unsafe, inoperative, and un-towable vessel floating in the Pacific Ocean in order to allow the defense to gather even more negative results would not further the defendant's argument.

Finally, the defendant's contention that preserving the vessel would have allowed him to prove that the vessel was incapable of holding the very packages that the defendant has been video-taped jettisoning *from that very vessel* does not save his sinking argument. Accordingly, the first prong of the *Trombetta* and *Bower* analysis is not satisfied here because the defendant has not pointed to a single piece of exculpatory evidence that was destroyed in the sinking of the vessel.

The defendant also fails to address why the voluminous photographs, videos, and witness statements regarding the condition and contents of the vessel do not provide

comparable evidence reasonably obtainable from other means is available. *Trombetta*, 467 U.S. at 489. Similar evidence in other 'boat cases' has been sufficient for expert witnesses to offer opinions on the viability of a vessel engaging in commercial fishing. Also available to the defendant is the opportunity to cross-examine boarding team members about the condition and suitability of the vessel to engage in commercial fishing. *United States v. Binker*, 795 F.2d 1218, 1230 (5th Cir. 1986).

### C. The Claimed Evidence is Not Even Potentially Useful and There is No Showing of Bad Faith on Behalf of the Coast Guard

The discussion above adequately demonstrates that the proposed evidence (the freezers, the ION scans, fishing equipment, and the size of the vessel) are certainly not exculpatory. Indeed, the proposed evidence doesn't appear to be particularly useful to the defendant. However, even if he could float some theory of usefulness, the defendant cannot establish that the Coast Guard destroyed the evidence in bad faith. In order to prove that the United States acted unconstitutionally in destroying evidence, the defendant must show that the United States Coast Guard intentionally destroyed evidence in bad faith. *Youngblood*, 488 U.S. at 58. The determination of whether the United States acted in bad faith turns on the knowledge of the exculpatory value of the evidence at the time the evidence was lost or destroyed. *See Youngblood*, 488 U.S. at 56.

The defendant presents no evidence that the USCGC *Hamilton*'s crew was aware of any exculpatory or useful information in the vessel. *See Trombetta*, 467 U.S. at 489 ("To meet this standard of constitutional materiality, evidence must both possess an exculpatory

value *that was apparent before the evidence was destroyed*, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.") (internal citation omitted) (emphasis added). The items aboard the vessel, i.e., a chicken cage, refrigerators, cooking equipment, an old fishing net, and five gallon buckets with used oil filters, were not the type of evidence that would have been potentially useful to the defendants or possess any exculpatory value (much less, an exculpatory value that was apparent before it was destroyed).

In fact, the Coast Guard took great pains, at risk to themselves, to operate the *Yue Shan Wei Yu*. As the exhibits demonstrate, the Coast Guard personnel suffered through multiple engine explosions with sparking batteries as they attempted to drive this vessel for several days. Eventually, the vessel became dead in the water. Far from showing bad faith, the selfless acts of the Coast Guard personnel show extraordinary good faith.

Before sinking the vessel, crew members took numerous pictures and videos from different angles. In sinking the vessel the USCGC *Hamilton*'s crew eliminated a hazard to navigation. *See United States v. Revolorio-Ramo*, 468 F.3d 771, 773-75 (11th Cir. 2006) (Coast Guard's destruction of defendants' boat as a hazard to navigation did not warrant dismissal of the indictment where government in good faith attempted to take pictures of the vessel, though the pictures were ultimately not useful).

Finally, it is worth considering what would have happened if the USCGC *Hamilton* had not sunk the *Yue Shan Wei Yu*. The defendant's vessel was dead in the water and

11

incapable of being towed because its towing equipment was missing due to rust. So, if the defendant had his way, the USCGC *Hamilton* should have left the vessel floating in the Pacific Ocean, despite of course any safety concerns associated with doing so. The government submits that, under that scenario, the defendant's ability to access the vessel would be no different from what it is today.

## IV. Conclusion.

Accordingly, based upon the aforementioned, the government respectfully submits that the Defendant's Motion to Dismiss should be denied without a hearing.

Respectfully submitted,
JOSEPH D. BROWN
United States Attorney

/s/
JAY R. COMBS
Assistant United States Attorney
101 East Park Blvd., Suite 500
Plano, Texas 75074
Jay.combs@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify a true and correct copy of the foregoing was served by electronic filing via CM/ECF to defense counsel on this 20th day of July 2018.

/s/
JAY R. COMBS
Assistant United States Attorney